## NEW YORK OYER AND TERMINER.

### April, 1849.

Before Edmonds, Justice, and two aldermen.

---

### The People v. William Donaldson.

All challenges to jurors for cause must be interposed at the same time. After a challenge for principal cause has been tried, a challenge to the favor cannot be made.

A juror challenged for having formed an opinion cannot be made to answer whether he has formed such opinion, because the answer would degrade him.

A mere hostility to capital punishment will not exempt a juror from service. To be so exempt he must belong to some religious denomination, and have such scruples as would prevent his finding a verdict of guilty, where capital punishment would follow.

When a homicide is excusable, or justifiable, and when murder or manslaughter.

The prisoner was indicted for murder.

In impaneling the jury, the prisoner challenged a juror for principal cause, on the ground of having formed and expressed an opinion as to his guilt or innocence.

The challenge was tried by the court, and judgment rendered that the challenge was not true.

The prisoner then interposed a challenge to the favor, on the ground of bias, in having formed an opinion.

*The District Attorney* objected that the challenge was too late, as all the challenges for cause must be interposed at the same time, and that when the juror is called to be sworn.

*The Court* so held, and for the reason that as the challenge for principal cause is triable by the court, and that to the favor by triers, the practice objected to would, if allowed, be virtually constituting the triers a board of review over the ruling of the court.

A juror was challenged to the favor, for bias, in having formed an opinion, and the juror himself was sworn as a witness on the trial of the challenge. The counsel for the prisoner, who had interposed the challenge, asked the juror if he had formed any opinion as to the prisoner's guilt?

*The District Attorney* objected to the question, on the ground that the juror was not obliged to answer the question, and the challenge must be supported by other evidence than that of the juror.

*The Court* said: It is true the juror cannot be compelled to answer the question, but he is a competent witness on the point, and he may answer the question if he pleases. The reason why he cannot be compelled to testify is because the answer may tend to disgrace him, for it is certainly as shameful a violation of duty for a man who knows he is liable to perform jury duty, to form an opinion on a case which may come before him for trial, as it would be for one of the judges, during the sitting of the court, to form an opinion in a case yet to be tried. It is the duty of both those functionaries to take care to keep their minds free from all bias, and it is cer-

tainly disgraceful for either to avow that they have violated
that clear dictate of duty.

The answer which the question may draw out must be not
merely one that may tend to disgrace the juror, but such a
one as will directly and certainly show his infamy; and the
court must see, for itself, that the answer will do that before
it can excuse him from answering. Here it is manifest that
if the juror, knowing that he was liable to sit in the particu-
lar case, had formed an opinion upon it, it would certainly
and directly show his infamy. But it is for the juror to
object, not the counsel for the party. The juror may be used
as a witness on the trial of the question of his own indiffer-
ence, and he may, if he pleases, degrade himself.

The juror answered the question, and the challenge was
found "untrue."

A juror was challenged by the district attorney for princi-
pal cause, on the ground that he was opposed to capital pun-
ishment.

The juror, being examined, testified that he was opposed to
capital punishment, so that he was afraid that he should lean
more to mercy than to justice.

*The Judge:* It is precisely such men that we want on our
juries. That is the way God deals with us, and the way man
ought to deal with his fellow. I, too, am opposed to capital
punishment, not because I think we have no right to take
life when the good of society demands it, but because it is a
relic of barbarous days, unbecoming an enlightened age, and
because it is a futile punishment. All experience has shown
that the fear of death is a poor deterrent from crime, and that
is shown strongly in the fact that to one compulsory execu-
tion for crime there are hundreds of voluntary suicides.

Still, as long as the law demands it, it is the duty of courts
and juries to enforce it, and it is no objection that doubts of
the wisdom of the law should cause them to temper justice
with mercy, and deal gently with the erring.

The People v. William Donaldson.

The law relieves from the duty, in capital cases, those only who belong to some religious denomination whose opinions are such as to preclude them from finding any defendant guilty of an offense punishable with death.

The challenge was overruled.

It appeared on the trial that the deceased was a laboring man, about twenty-three years old, stout and compactly built. He was addicted to the use of liquor, and when under its influence was quarrelsome. He was an Irishman.

He was slain in one of the streets of New York, about one o'clock at night. He had spent all the night, thus far, in drinking saloons, and was on his way home with one of his companions when they met a party of three or four men who were singing, and evidently in high spirits. As the parties met each other, the deceased stopped, raised his fists in a fighting attitude, turned 'round, as if for a fight, and called them sons of bitches. The party of singers started and ran away from him. He ran after them and overtook them. One of the party told him to go away; he was drunk, and they did not wish to have anything to do with him. The prisoner said something to him, and he "squared off" against him. The prisoner retreated some twenty paces, the deceased making passes at him, until the prisoner, with his left hand, struck him one blow. The deceased retreated up the street a short distance, and then returned toward the prisoner, who turned and fled with his companions. One of them said to the prisoner, "You hit him a pretty good lick; you have knocked the rum out of him." This was said because they saw the deceased had fallen, and was vomiting. The prisoner answered he was sorry for what he had done. He then had a dirk knife in his hand, one that he was in the habit of carrying about with him, and which opened with a spring. One of his companions said to him, "You didn't use that, did you?" He replied, "He was a bigger man than

me, and I didn't know but he would kill me and get the best of me. I'm afraid he will never speak again."

The prisoner was a slight man, of about twenty-six years of age; was the clown and comic singer at a circus, and was returning home after an evening's performance, when thus assailed by the deceased.

The witnesses testified that there was no way for the prisoner to escape, unless he could have beat the deceased in running, and that when the fatal blow was given, the prisoner was in imminent danger of being struck by the deceased, who was a much stronger man than him.

In a short time after the prisoner and his party retreated, the watchmen found the deceased lying on the sidewalk. They removed him to the watch-house, and when they got there they found he was dead, from a stab he had received just over the right collar bone.

The police had no clue to the perpetrators of the homicide, and they arrested and held in custody the man whom the deceased was accompanying home when the affray occurred.

The prisoner heard of this and said it was unfair that an innocent man should be made to suffer. He therefore concluded to leave New York, after obtaining from his companion who had been with him, in the affray, a promise that as soon as the prisoner got away from town, he would disclose the whole affair to the police.

He accordingly left New York, and went to New Orleans, but his companion did not make the disclosure, because he deemed it unnecessary, as the man who had been arrested had been set free.

In the mean time, the police could obtain no clue to the perpetrators of the homicide, though a reward of $500 was offered.

This occurred in November, 1847. From that time until March, 1849, the prisoner was engaged in performing at circuses in the southern and western parts of the country. At the latter date he returned voluntarily to New York, and

gave himself up to the Court of Sesssions to stand trial for the offense.

*David L. Graham*, for the prisoner, made the following points:

I. To convict the defendant of murder the jury must find two things:

1. That the killing was unnecessary.

2. That it was the result of pre-intention on the part of the defendant; that it was perpetrated from a premeditated design to take the life of the deceased.

II. If the jury believe that the act of the defendant, though not murder, was still criminal, it would be either manslaughter in the third or fourth degree. If the defendant used a dangerous weapon it would be manslaughter in the third degree; if not, it would be manslaughter in the fourth degree.

III. A dangerous weapon is one which cannot be used without taking, or directly endangering, human life, or where the chances are in favor of such a result.

IV. A weapon not dangerous is one which, though under some circumstances it can take human life, takes it rather as the result of accident or misfortune than as the necessary consequence of its being made use of.

V. A dangerous weapon is one constructed solely for the purpose of taking human life.

VI. If the defendant was in the habit of carrying the knife described by Gossin, as a necessary incident of his business, and the jury believe that was the knife which occasioned the death of the deceased, it would not be a dangerous weapon.

VII. The lawful defense of one's person means either the defense of the person itself, or the rights conferred by the usages of society and the law, and which are incident to the person. In such cases, the assailed party is not bound to retreat; he is entitled to maintain his ground, and oppose resistance to invasion, even to the extent of taking human life.

VIII. The law requires a retreat in cases of excusable homicide alone; and that, for the reason that the killing was the result of a mutual combat, in which the law attaches blame to both parties.

*N. P. Blunt, district attorney,* made these points:

1. The unlawful taking of human life, in the absence of any testimony as to design, or otherwise, is to be presumed to be by premeditated design. The unlawful taking of life includes the idea of the intent necessary for murder, unless the circumstances absolutely exclude the intent.

2. If a weapon is susceptible of producing, and was likely to produce, death, by a certain use, and was used in that manner, then, for the purposes of the case, independently of its general character, the weapon is to be regarded as a dangerous weapon.

3. The necessity of taking life must be clearly proved, and the burden is upon the prisoner to produce such proof to the perfect satisfaction of the jury that such necessity existed.

4. No man has a right to use more than so much force as is necessary in his own defense, and no trespass will justify or excuse homicide. As the right of passage had been intruded upon, and the trespass was already committed, the act of the prisoner was rather resentment of, than resistance to, the trespass.

5. The proof is not that the prisoner was trespassed upon, but that he provoked a quarrel by assuming to prevent a trespass perpetrated upon Gossin, which trespass Gossin himself excused, and which interference of the prisoner Gossin utterly disavowed.

6. "Great bodily harm," as used in the statute, does not mean a mere beating, but some maiming or permanent disfigurement, or some harm great enough to endanger life or health.

*The Judge* charged the jury that there being no dispute

The People v. William Donaldson.

in the case that the homicide had been perpetrated by the prisoner, the question was, what was the quality of the act? Was it murder, or manslaughter, or excusable or justifiable homicide?

Was it excusable? That depended on whether it had been by accident or misfortune, upon any sudden combat, and without any dangerous weapon being used.

Was it justifiable? To make it so it must have been committed in defense of himself when there was a reasonable ground to apprehend a design to do some great personal injury, and there was imminent danger of such design being accomplished.

Upon this point the inquiry was, not whether the prisoner apprehended an evil design, but whether the jury think, under the circumstances, there was reasonable ground for his fears.

So, too, it must be a great personal injury that was to be apprehended, and not a mere assault and battery, for then a mere blow with the fist would justify the taking of life.

And so, too, as to the "imminent danger," it was for the jury, and not the prisoner, to say there was such danger.

To determine these questions, the jury must inquire, was the fatal blow necessary for self-protection? To produce that necessity the prisoner must have retreated as far as he could. However chivalrous he might have felt, he had no right to stand his ground at the risk of sacrificing a human life, and he must make it appear that he used all due precautions to prevent fatal consequences, and that there was no fault on his part.

If, however, the jury could not excuse or justify the act, then it was murder or manslaughter.

To make it murder, the jury must be satisfied beyond all reasonable doubt, that the blow was struck with an intention to kill.

If they were not satisfied that there was such an intention, then the offense was manslaughter; and it was manslaughter in the third degree if a dangerous weapon had been used; that

is, if the weapon used, though made for other purposes, could not be used in striking a blow at the human body without endangering life.

The prisoner was convicted of manslaughter in the third degree.

[NOTE.—A touching incident occurred when the prisoner was brought up for sentence. His mother was present, and sent to the court a request to be by his side when sentence was pronounced. It was granted, and she took her seat by his side. She was of middle age, plainly dressed, but a very interesting woman. She held his hand in hers while he was receiving his sentence. The sentence was never executed. The presiding judge interposed and obtained from the Governor a pardon, on the ground that all had been done that the supremacy of the law required, and that all beyond would be unnecessary suffering, and ruin to a young man who had shown throughout the deepest penitence, and gave the fairest promise for the future.]